[No. 1880.]

*Ex Parte* THOMAS CATNEY AND GREEN HAMMONS.

1. MURDER — HABEAS CORPUS — EVIDENCE. — See the statement of the case for evidence *held* insufficient to support the judgment of the court below in refusing bail, on a charge of murder.

2. SAME. — TRANSCRIPT in *habeas corpus* cases for bail should show the pecuniary circumstances of applicants, and their ability to make bond, in order to enable this court, if it allows bail, to act intelligently in fixing the amount.

*Habeas corpus* on appeal from a judgment in chambers rendered by the Hon. T. L. Nugent, judge of the thirtieth judicial district, refusing the applicants bail.

The relators were held under an indictment, presented in the district court of Palo Pinto county, Texas, on the 6th day of September, 1884, charging them with the murder of George Ingle, in Palo Pinto county, Texas, on the 8th day of April, 1884.

It was agreed between counsel for the State and the relators that the written testimony taken on the examining trial, held on April 19, 21, 22, 23 and 24, 1884, should be read in evidence in addition to such other testimony as the parties should see proper to introduce. The relators first introduced and examined their witnesses who were present. In order, however, that the narratives, *pro* and *con* the application for bail, may be better connected, the State's testimony, as taken from the proceedings before the examining trial, is first summarized in this report.

A. H. Peach was the State's first witness. He testified that he lived in Palo Pinto county, about a half mile west from the town of Gordon. On the day of the murder of the deceased, April 8, 1884, the witness left his house, going to Rock Creek to hunt for some horses. He arrived at the house of the deceased at about high noon on that day. Failing to find Mr. Ingle at home, the witness started to his, Ingle's, field, and, before reaching the field, found the dead body of Ingle, lying back down and hands crossed on the breast. Witness went thence to a house he understood to be occupied by a Mr. Guest, but, failing to find any male person there, went on to Mr. Coleman's, and with Mr. Coleman returned to the body. He found that Ingle had been shot in the head above the right eye. Mr. Coleman remained with the body, and witness repaired to the town of Gordon, where he reported his discovery to justice of the peace Gibbs. Witness, as one of the coroner's jury, returned to the body with the other jurors and Mr. Gibbs. A close

examination of the body disclosed five wounds, one under each shoulder blade, one in the breast, one in the neck and one in the head. The body lay outside of the field and about one hundred paces distant from the fence. The deceased's plow was standing in the field, and the ground showed that some one had been about or near it. The tracks of two horses, one shod in front, and the other barefoot, were trailed westward on the outside of the field. This trail was followed about two hundred yards. Witness did not go inside of the field, but saw where the fence was broken down to the extent of two rails. No object of any kind was found in the hands of the deceased, but his whip lay near his feet. The physicians present cut a thirty-eight calibre ball from the wound in the deceased's neck. The witness found the dead body of George Ingle in Palo Pinto county, Texas, on the 8th day of April, 1884.

The witness reached the town of Gordon about 3 o'clock on the evening of April 8, 1884. He saw both the defendants, W. T. Catney and Green Hammons, in Gordon on that evening, but did not recollect that he said anything to either of them about the murder, nor did either of these defendants say anything to witness about it. Witness did not know that the defendants Catney and Hammons were acquainted with the deceased. Witness made no other discoveries at the place where he found the body, than the tracks described. The defendant W. T. Catney was one of the coroner's jury, and as such juror was present at the inquest. Witness did not know where the defendant Hammons and Sam Pharr were at the time of the inquest. The coroner's jury was composed of the witness, the defendant Catney, Mr. Askew, Mr. Beckham, Mr. Stuart, and a stranger to the witness. Witness did not, during the inquest, hear the defendant Catney say anything in regard to the deceased's character, nor did he in the hearing of witness express any theory of the murder. The jury divided into parties and individuals when they began to examine the ground about the body. Witness was first with one juror and then another, but for the greater portion of the time was with Doctor J. C. Bates. Witness examined to see if the horse tracks discovered were the same on all parts of the ground. The tracks indicated that, when made, the horses were running. These tracks continued near each other as far as witness trailed them. Witness did not himself notice that the tracks of one of the horses passed near the body, nor did he discover the direction from which the tracks showed the horses to have come to the scene of the killing.

Cross-examined, the witness stated that the horse tracks led off

westward from where the fence was down. Witness was not aware of any ill-feeling between the deceased and either of the defendants. He had no recollection of hearing the defendant W. T. Catney say anything to his brother, G. W. Catney, about the murder, when he saw defendant Catney in Gordon on the evening of the day on which Ingle was killed.

Doctor J. C. Bates was the next witness for the State. He testified that he was present at the inquest held over the body of George Ingle, about 4 or 5 o'clock on the evening of April 8, 1884. The witness's examination of the body was not a minute one. He found five gun-shot wounds on the body. One entered the left side, just below the nipple; others, penetrating from behind, entered the body just below each shoulder blade; another penetrated the back of the neck, and the remaining one entered the head over the right eye. The face, nose and right ear of the deceased were powder burned. The witness probed one wound under the shoulder blade, and also the one over the eye, which last wound he considered fatal in itself. This examination was made on the day that the deceased was killed. Witness made a somewhat extended examination of the ground. On his arrival he sought Mr. Coleman, the man whom Mr. Peach had left with the body when first discovered. Coleman and the witness went to where the plow had been standing, in the field, some seventy-five or a hundred yards from where the body lay. Witness there found the tracks of some party who had been plowing. He noticed also the tracks of several other parties about this point, and the tracks of some party going from the end of the plowed land across to the fence. It was the opinion of the witness that the shots which penetrated the body under the shoulder blades were fired by some one who stood in the rear of the deceased, and that the shot which penetrated the head over the eye was fired after the deceased had fallen, or, if fired before, was fired by some one on horseback. This wound over the eye was, in the opinion of the witness, caused by the last shot fired. It was, in the opinion of the witness, necessarily a fatal wound, in itself, though it may not have been sufficient to produce instantaneous death.

The witness saw the defendant Catney at the inquest, but did not see either Hammons or Pharr. He noticed nothing about the manner or deportment of Catney on the ground that indicated uneasiness or anxiety of mind. Witness had been told by some one present that suspicion attached to Catney and Hammons, and for that reason he observed Catney's movements and manner more closely. Witness could call to mind but two circumstances in the defendant Catney's

conversation that day that made any particular impression on his mind. One was the defendant Catney's question: "You have seen the ground; who do you think did the killing?" to which question the witness replied that he had no theory on the question. The other was the remark of defendant Catney as he and witness started home: "Mr. Gibbs says that the parties who did this killing will be known in three days; what do you suppose Gibbs meant by that remark?" To this query witness replied: "I suppose that Mr. Gibbs meant that if he had done the killing he (Gibbs) would want to get away." To this Catney replied: "Yes, and if I had done this killing I would too, and would be going yet." In speaking of the deceased's reputation before he moved to the neighborhood of the killing, defendant Catney said that he had heard of charges against him, deceased, but knew nothing personally about these charges. Witness never afterwards observed anything peculiar in the manner of either of the defendants.

Doctor W. G. Hart, testifying for the State, described the wounds on the body of the deceased substantially as they were described by Doctor Bates, and declared it to be his opinion that the wounds caused the death of the deceased. In this witness's opinion, the wounds in the back were inflicted while the deceased and his assailant were both running. The wound over the eye was fired by some one standing over the deceased after he had fallen. It could not, in this instance, the witness thought, have been fired by a man on horseback eight feet distant. The horse tracks were about twenty or thirty feet from the deceased's tracks. Witness cut a thirty-eight calibre ball from the wound in the deceased's neck.

R. H. Rogan was the next witness for the State. He testified that he was engaged in the mercantile business in the town of Gordon. The defendant Hammons purchased a thirty-eight calibre pistol from the witness on the Saturday or Monday,—Monday the witness thought,—prior to the killing of Ingle. Hammons purchased the pistol openly, with no manner of concealment. He did not take with him all of the cartridges that go with pistols on sale. Witness sold other pistols to other parties on the same day. He sold pistols of the same calibre to other parties, both before and after the purchase by the defendant Hammons.

A. Butler testified, for the State, that he was the proprietor of a wagon and blacksmith shop in the town of Gordon. On the 8th day of April, 1884, witness took two shoes from the horse of the defendant Catney. One of these shoes, a number one snow-shoe, well worn at the toe, the witness still had. Mr. Stewart called at

the witness's shop on the 9th of April and got the other. Witness first saw Oatney at his shop on April 8 — the day of the killing — about ten minutes past 11 o'clock, by witness's watch, which was about twenty minutes slow. Defendant Hammons, who had left a plow to be stocked, came to witness's shop between 10 and 11 o'clock, and again that evening. Witness did not notice that he appeared uneasy or anxious. When Oatney first brought the horse to the shop he said that he wanted the old shoes taken off and new ones put on by noon, as he wanted to go cow-hunting that evening. Oatney's horse was shod only in front. Witness did not notice that the animal showed evidence of having been ridden severely. Witness noticed no sweat on the animal, but the animal had been at the shop at least one hour before witness shod him.

J. P. Smith testified, for the State, that he was a shoe-maker, residing in the town of Gordon. During the preceding fall, witness made Green Hammons, one of the defendants, a pair of number five boots, pegged, double-soled, half scotched, and flattened. Hammons had on these same boots on this trial. Witness knew a number of men about Gordon who wore number five boots.

J. N. Jones testified, for the State, that during the week preceding the murder of Ingle he bought a hog from the defendant Hammons, Mr. Swanner taking half after it was butchered. Witness afterwards described to the deceased the hog's ears, which had the appearance of having been worm eaten or torn by dogs, but told him that he could not swear to the mark. Hammons came to witness's house two or three days after the killing of Ingle, and asked what Ingle had said to witness about the hog. Witness told him that Ingle asked for the hog's ears, but that witness did not have them, and that Ingle then said he would let the matter drop and go no further with it; that he would not prosecute without positive evidence. In reply, Hammons remarked that he greatly regretted having had trouble with Ingle shortly before his death. A day or two after this conversation, the defendant Hammons asked the witness if he, witness, saw him, Hammons, driving horses past witness's field on the morning of the killing. Witness replied to Hammons that he did not. Hammons then remarked: "You (witness) were plowing in your field on that day." Witness did not plow in his field that day, but plowed one or two rounds near his house about 8 o'clock on that morning. Witness was about his house during the whole of the day of the killing. Hammons left, saying he would go and see if Mrs. Glenn did not see him on that day. Hammons was not then under arrest, but said that he was hunting evi-

dence because he was suspected of the murder of Ingle. Witness understood that Hammons and Ingle had had a disagreement about a hog.

Cross-examined, the witness stated that he had never had a conversation about the hog matter with Hammons until after the killing of Ingle. Hammons told witness that prior to Ingle's death he had one difficulty or disagreement with him in town and one in the field about the hog. He said that at the talk in the field Ingle agreed to let the matter drop and say nothing more about it unless the grand jury took it up.

J. A. Swanner testified for the State, in substance, that he got one-half of the hog spoken of by the witness Jones, taking the same home from the defendant Hammons's house. A few days before the death of Ingle, Hammons came to witness's field and told witness that Ingle had that day told him that witness had the head of a hog that he, witness, would swear belonged to him, Ingle. The witness in reply to Hammons denied that he had told Ingle that he would swear to anything concerning the hog, and advised Hammons to bring Ingle to his, witness's, house, to settle the disagreement without a difficulty. Hammons said in reply that Ingle might come to witness's house first, in which event, if notified, he would come at once. Witness also told Hammons on that occasion that Ingle had examined the ears of the hog, and said that he would swear to them; to which Hammons replied that he thought he could prove the hog. Hammons did not then appear to be in a very good humor.

Cross-examined, the witness stated that Hammons, on the occasion alluded to, left in apparently good humor, saying that witness could exhibit the hog's head in Gordon, if he wanted to.

W. J. Glenn testified, in substance, that some time prior to the killing of Ingle, the defendant Catney, in conversation with him, witness, about the theft of hogs, remarked that somebody was stealing Hammons's hogs. Witness remarked: "I reckon this gets away with the theory of Hammons having stolen the hog." Catney replied: "Yes; I believe that if I encouraged Hammons a little, he would kill somebody about that hog yet." Ingle's name was not mentioned in that conversation.

State's witness Houx testified that he saw the deceased and the defendant Hammons in conversation in the town of Gordon on the Saturday evening preceding the murder, but heard none of the conversation.

W. H. Stuart, on behalf of the State, presented and explained a

chart or plat of the ground at and about the scene of the murder.
In addition, he testified that he applied the horse shoe he obtained
from Butler to the track of the shod horse found in the immediate
vicinity of the body, and found it to fit in every particular.

R. W. Watson was the next witness for the State.   His testimony
covers a large number of pages in the record, much of it relating to
the topography of the country.   Only so much of it as is deemed
absolutely essential to an understanding of this report is here given.
He testified that he resided in the town of Ranger, in Eastland
county, and was engaged in raising horses.   He had removed to East-
land county from Grayson county about two years prior to the date
of the killing of Ingle.   On Saturday, April 4 or 5, 1884, the witness
had his horse shod in the town of Ranger, and on Monday started
on a horse hunt.   He traveled through what was known as the
Cowden neighborhood to Rock Creek, intending, if possible, to reach
the defendant Catney's house and pass the night.   He had once
before, one or two years previously, spent a night with Catney, and
had seen him in Gordon.   Witness, however, failed to reach Cat-
ney's that night, and camped about one and a half miles from his
house on a hill.   Witness reached Catney's house on Tuesday morn-
ing when the sun was about an hour or an hour and a half high.
He went there to ask Catney if he had seen any of his, witness's,
horses.   He found only a lady at the house, whom he took to be
Catney's wife.   This lady told witness that Catney had gone to
see about or drive up some horses.   She did not say when he
would return.   Witness went thence west, up Rock Creek, about
three miles distant.   After crossing the creek, and as he passed
around a rocky hill, he heard three distinct reports of a gun or
pistol, and, he thought, a man halloo.

Upon hearing these reports the witness started in the direction
from which they came, and, after traveling a distance of some two or
three hundred yards, he saw two men, walking rapidly, one of whom
had in his hand a small new pistol.   These men were then about one
hundred yards ahead of the witness.   Witness having heard turkeys,
and supposing that they were hunting, cried to them: "Did you get
it."   The man with the pistol looked back; the other did not.   The
man who did not look back, the witness took to be Mr. Catney (the
defendant), which was another reason why he hollooed.   The man
who had the pistol and looked back, the witness did not then know,
but has since identified as the defendant Hammons.   The two par-
ties increased their speed, and the witness turned back because he
thought from their actions they did not want to be overtaken, and

he was not armed. This was about 8 or 9 o'clock, on Tuesday morning, April 8, 1884.

An old house stood on the creek about two hundred yards east of where the witness saw the two parties. Some fifty or sixty yards west of this old house was an old cow pen, and between one hundred and fifty and two hundred yards west of the cow pen there was a gate which led into a field. Witness thought at the time that he saw one or two horses standing in the field. He did not notice whether any of the field ground had been plowed, nor was he nearer this field than two hundred yards. Witness had previously been in sight of this field, and on one occasion saw a man, a short distance from the old house, named Ingle, to whom he gave a memorandum of his horse brands. This was on Friday previous to the Tuesday on which witness saw the two men and heard the shooting. When the witness first saw the two parties on the Tuesday spoken of (April 8, 1884), they were traveling somewhat in a north direction, turning shortly to an easterly course in the direction of the old house, which witness understood to be occupied by a man named Watson. The witness drew and explained a diagram of the country from the point he occupied at the time he saw the parties.

The defense subjected this witness to a searching and severe cross-examination, which related principally to the topography of the country. He stated that he was but indifferently familiar with the vicinity in which he saw the two men on April 8, 1884. He had passed through it several times. Witness had hunted horses in the Rock Creek country, and found horses there a few times previous to this trip. When he started on this trip, the witness started with the intention of hunting the country thoroughly, and intended, if he reached Catney's neighborhood in time, to spend Monday night, April 7, 1884, at his, Catney's, house. He could not recollect that he had spoken to Catney since he spent the night with him a year or two previously, but he had seen him in the town of Gordon. Witness could not, from recollection, give a precise description of Catney's place. Witness did not know the defendant Hammons when he saw the two men as described, on April 8, 1884, but recognized him, he thought, as the man who had the pistol, when he, witness, came to Palo Pinto court. Witness had no acquaintance with Ingle, the deceased, and had no recollection of having seen him but the one time, spoken of, when he gave Ingle the memorandum of brands.

A. J. Kerr testified, for the State, that about 11 o'clock on Tuesday morning, April 8, he, in company with Doctor Kinney, met

defendant Catney on his way to, or at least towards, Gordon. Catney, with his family and old Mrs. McCandless, were in a wagon with Mr. James Gibbs. A horse, bridled and saddled, was tied behind the wagon, or was being led by some one in the wagon. Witness stopped to speak to Gibbs, and Kinney rode on. State rests.

Mrs. Catney, wife of defendant Catney, was the first witness for the defense. She testified that the night of Monday, April 7, the night before the killing of Ingle, she, her children, husband and Sam Pharr, spent at Catney's house. They got up early next morning to go to Gordon, as agreed on Saturday, with Hammons and his family, in Hammons's wagon. Mr. Catney and Pharr got up first, built a fire in the kitchen stove, and went out to milk. When they returned, having milked all the cows but one, the witness had breakfast ready. Witness took no note of time, but was about thirty minutes getting breakfast. At, or a little after breakfast, Mr. Catney remarked to witness that, if she wanted to go to Gordon, to get the children ready, clean up, etc., while he got up and harnessed the horses, and that they would go in their own wagon. Witness directed her children to clear up the breakfast table hurriedly, and get ready while she milked the cow not milked by Mr. Catney before breakfast. Mr. Catney went for his horses, of which he had three, two in the pasture and one near by, outside. Witness was at the cow pen but a few minutes, not exceeding fifteen, and when she returned, her husband, defendant Catney, had the horses nearly harnessed. The defendant Hammons was with him, horseback. Hammons staid but a short time, and rode off. Witness's little girls washed the dishes, witness cleared things up, arranged three beds, and got ready to go to town. In answer to witness's question, Mr. Catney told her that Hammons, who was on a horse hunt, had stopped by to say that his wagon could not be used to go to town. Pharr by this time had left the house, presumably to resume his work cutting poles. Watson, the State's witness, did not, nor did any other party, call at the house and ask for Mr. Catney on that morning. About half-past 8 or 9 o'clock, Catney, witness and children started, with Catney's riding horse tied behind the wagon. They stopped at Hammons's house. Mrs. Hammons, who had intended to go with the party, declined going on witness advising her that the weather was too cool for her baby. Hammons's house was reached about 10 o'clock. They stopped at Hammons's about ten minutes, got "Grandma" McCandless, and drove on to Gordon. They met several parties en route, among them Messrs. A. J. Kerr and Kinney, and she saw Mr. Self at the mill. It had been arranged

that Mr. Catney was to go horse hunting from Gordon, and that "Grandma" McCandless was to return with witness. The party reached witness's mother's house on the suburbs of Gordon about 11 o'clock.

Mr. Catney and witness had lived in the town of Gordon, but, about two years previous to this trial, bought and moved to the place they now occupied. They commenced improving the place immediately upon occupying it, and speedily brought it to its present condition, which the witness minutely described. It was in its present condition when the State's witness Watson spent the night there, shortly after its occupation by Catney and the witness. Witness had no recollection that on their way to Gordon, on the morning of April 8, they stopped when they met Kerr.

Mrs. E. J. Hammons, wife of the defendant Hammons, testified for the defense, in substance, that she lived in the same house with her husband and Mr. and Mrs. McCandless, her grandparents, about one and a half miles from the defendant Catney's house. They ate breakfast about 8 o'clock on the morning of April 8, 1884, having determined to abandon a previously formed purpose to go to town that day. Mr. Hammons left immediately after breakfast to get up his horses. He returned with one in thirty minutes. He saddled this horse and rode off to hunt his other horse. Within thirty minutes the witness saw her husband on the top of a mountain north of the house, a point to which he usually went when hunting his horses, as its altitude enabled him to command a view of a large territory. He returned with the second horse about 10 o'clock. Just as he was penning this horse, Mr. Catney and his family, *en route* to Gordon, drove up. Mrs. Catney came into the house and remained until Mrs. McCandless got ready to go, when they, the Catneys and Mrs. McCandless, left for Gordon. From the time he got up that morning, until the Catneys passed at 10 o'clock, the defendant Hammons was not absent from home longer than a half hour at one time. He was absent twice, about thirty minutes each time, in search of his horses. Some time after the Catneys passed, Mr. Hammons left his house, saying that he was going to Johnson's to get some one to dig a cistern. He returned about 1 o'clock, went to Gordon, and returned that night. Witness was certain that her husband was not out of her sight from the time he got up until he first left to hunt his horses, which was after breakfast, and they ate breakfast about 8 o'clock.

The foregoing was the testimony taken on the examining trial, and read by consent on this hearing. The following additional testimony was adduced:

W. H. Stuart, for the applicants, testified that he was present at the inquest and examined, with considerable care, the tracks upon the ground. The tracks of but two men were found in the field. One of them was the tracks of the deceased; the other that of a man who wore a number five boot or shoe. Witness found horse tracks proceeding from the point where the deceased got over the field fence, to the place where the body was found, sometimes circling twenty or thirty yards from the direct route pursued by the deceased. The horse making these tracks was shod in front with old beveled, or what is known as snow-shoes. The witness afterwards compared to these tracks an old shoe which he obtained from old man Butler in Gordon. That shoe corresponded with strict accuracy to the track, and it was the belief of the witness that that shoe made those tracks. The track of this horse turned near where the body lay, and went by a point west, where another horse · had been hitched to a tree. Witness could trail the horse track but a very short distance from the field. Witness had heard that the applicants were suspected of the murder and that Catney had had his horse's shoes taken off by Mr. Butler. He went to Butler, got the shoe which Butler said he would swear was one of the identical shoes he pulled from Catney's horse's feet, and that was the shoe he applied to the tracks.

The witness was well acquainted with Catney, but did not know Hammons so well. He had often seen them together, and judged from appearances that they were quite good friends. Witness had heard them speak of Ingle, the deceased. They spoke of having lost some hogs, or of having the marks of hogs changed, and said that they were satisfied Ingle got the hogs. Catney told witness that Hammons went to Ingle about the matter, and that Ingle had virtually agreed to pay for the missing animals, but wanted the transaction so concluded as to protect him from prosecution. Catney remarked: "We, as honest men, must work some plan to protect our property. We cannot support our families and permit our property to be stolen." Witness replied that it looked very much like means to detect depredators on their property should be devised. Catney thereupon remarked that, "We ought to organize into a little band to catch the thieves." Witness replied that he already belonged to such an organization. Catney said that that organization was too large, and witness replied that if large organizations were powerless he thought small ones would prove powerless. Catney then remarked that he could not support his family and submit to this thievery, and that "they had to stop stealing his property." Nothing was said to witness about making Ingle leave

the country.   This conversation with Catney occurred some time in February, 1884.

Witness was in his field, about a half mile away, when Ingle was killed.   He heard some ten or twelve reports of fire-arms, between 9 and 10 o'clock on the morning of the killing.   They came from the direction of the upper corner of the deceased's field, about where the body was afterwards found.   He heard some one hallooing at about the same place at the time.

On his cross-examination, the witness described the boundaries of Ingle's field.   Witness did not absolutely know that the track in the field was that of the deceased, but inferred as much from its resemblance to those behind deceased's plow, which still stood hitched in the field.   The first four shots sounded like the reports were from Winchester guns, and were fired about as rapidly as two men could shoot Winchesters.   The remaining shots sounded as if fired from small pocket pistols.   The shod horse track was first discovered about five feet from the fence, and about sixteen or eighteen feet from where Ingle got over the fence.   Thence it ran parallel with Ingle's course to a point a short distance beyond where the body lay, where it turned back to the point where first discovered. It then ran west, parallel with the fence, past the northwest corner of the fence, to the road, where it was lost.   Hammons was not present during the entire conversation between witness and Catney, detailed, but heard it in part.   Witness could only remember that, during said conversation, Hammons remarked that Ingle got his hogs, and that, unless paid, he intended to prosecute.

Palma Ingle, the widow of the deceased, was next introduced by the applicants.   She testified that she last saw her husband alive about 8 or 9 o'clock on the morning of April 8, 1884, when he started to his field, a mile away.   Hammons and Ingle were on good terms until about two weeks prior to the murder, when they disagreed about a hog which Hammons was accused of killing.   On the Thursday before the murder, Hammons and a man whose name witness did not know came to the field where Ingle and witness were at work.   Ingle and Hammons walked off a short distance and had a conversation,— the witness did not know what about. Ingle seemed to be in a good humor when he returned to witness. Witness knew nothing about the hog matter personally.   Witness knew of no threats to prosecute Hammons for theft of the hog.

Mrs. Catney testified substantially as she did before the examining court.

Mrs. McCandless testified, for the applicants, substantially as did

Mrs. Hammons on the examining trial, as to what transpired at Hammons's house from the time Hammons got up on the morning of April 8th until she left with the Catneys to go to Gordon, at 10 o'clock. She also corroborated the statements of Mrs. Catney as to what transpired thereafter on that day.

Doctor Kinney testified, for the applicants, that he met Catney and family and Mrs. McCandless near to and going towards Gordon about 11 o'clock A. M., Tuesday, April 8, 1884. They were in a wagon, Catney driving.

W. Ellis testified, for the applicants, that he went with Hammons to Ingle's field on the Wednesday or Thursday prior to the killing. A woman, presumably Ingle's wife, was at a wagon about one hundred and fifty yards away. After some conversation between Ingle and witness, Ingle and Hammons walked off some distance and had a conversation which the witness did not hear. Witness and Ingle talked about a cow. Hammons never mentioned Ingle's name in witness's presence until he introduced them on this occasion.

It was admitted that R. and S. P. Johnson would testify, if present, that the applicant Hammons was at the house of Miles Johnson, six miles north from Gordon, and three miles northeast from Hammons's house, not earlier than twenty minutes before 12 o'clock on the morning of April 8, 1884.

The testimony of Sam Pharr, for the applicants, was consistent with that of Mrs. Catney as to what transpired at Catney's house on the morning of April 8, 1884, from the time the family got up until the witness left to go to work, which was some little time after breakfast. Witness saw Hammons at Catney's house about half-past 11 o'clock. Hammons then said that he was going to Johnson's to get some one to dig a cistern.

*J. S. Straughan* and *McCall & McCall*, for the applicants.

*J. H. Burts*, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. Appellants in this case, after they were indicted for the murder of one George Ingle, applied for and obtained a writ of *habeas corpus* from the Hon. T. L. Nugent, judge of the thirtieth judicial district, who, after a full hearing upon said writ at chambers in vacation, refused bail to applicants. This appeal is prosecuted from said judgment refusing bail.

We have given the record a careful consideration, and our conclusion is that upon the facts as here shown, appellants are entitled

to bail. It is not the practice on such cases for this court to discuss the facts.

There is no evidence in the record as to the ability of the parties to give bail. Without any evidence upon this subject we have no guide save the charge preferred and the facts proven. In this case we fix the amount of the bail at the sum of $8,000 for each of the appellants, and the sheriff of Palo Pinto county is hereby directed to release the parties, or either of them, from custody, when they respectively execute a bond in said sum with good and sufficient sureties conditioned as the law requires, which bond or bonds, when so executed, said sheriff will file with the district clerk of Palo Pinto county.

Judgment reversed and appellants admitted to bail in the sum of $8,000 each.

*Ordered accordingly.*

[Opinion delivered December 10, 1884.]